IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UHSPRO, LLC,<br><br>                Plaintiff,<br><br>v.<br><br>SECURE DOCUMENTS, INC., doing business as MED-R MEDICAL SERVICES,<br><br>                Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PRELIMINARY INJUNCTION**<br><br>Case No. 2:17-cv-00411-JNP<br><br>Judge Jill N. Parrish |

Before the court is plaintiff UHSpro, LLC's motion for a TRO and for a preliminary injunction against defendant Secure Documents, Inc. (hereinafter, Med-R). [Docket 7]. The court held an evidentiary hearing on the motion on May 25, 2017. Because Med-R had notice of this motion, filed an opposition, and participated in the hearing on the motion, UHSpro's request for a TRO is moot. The court, therefore, treats UHSpro's motion as a motion for a preliminary injunction. The court DENIES the motion.

**FINDINGS OF FACT**

1. UHSpro, LLC was formed in February, 2015. [Tr. 17].
2. On February 26, 2015, UHSpro executed a sales contract with Med-R, an established company with existing relationships with medical practices in a number of western states. [Tr. 42]. Although the contract was signed in February, 2015, the document recited that it was executed on November 18, 2014 and was effective as of that date. [Ex. 2].
3. The sales contract stated that UHSpro "owns exclusive and non-exclusive rights in the Americas and parts of Europe . . . for the sale, distribution and servicing of bio-monitoring screening devices and all other products and Product related thereto

1

(collectively, the 'Product')." The contract designated Med-R "as an authorized non-exclusive independent representative to sell and promote all Product provided by" UHSpro. Med-R warranted that it would "devote such time, energy and skill on a regular and consistent basis as is necessary to sell and promote the sale of [UHSpro's] Product during the term of [the] Agreement." [Ex. 2].

4. The only biomonitoring screening device for which UHSpro had "exclusive and non-exclusive rights" at the time the contract was signed was the MaxPulse device. The parties to the contract understood that the defined term "Product" in the sales contract referred to the MaxPulse device and that a new agreement would have to be negotiated for any additional products to be marketed.

5. The MaxPulse device measures a patient's heartbeat. UHSpro also represents that the device can determine if the patient's arteries are partially closed or hardened. [Tr. 30].

6. Under the contract, Med-R would use its contacts with doctors to place the device with medical practices. Doctors would then use the device on patients and bill insurance companies, Medicare, Medicaid, and the patients themselves for the testing. The doctors would then retain a portion of the money collected for these tests and pay the rest to UHSpro and Med-R, which would split the remaining net revenue evenly.

7. In the spring of 2015, concerns were raised that the MaxPulse device did not meet the billing requirements for some of the tests that the device allegedly performed. After reviewing the device, UHSpro decided to retrofit the Max Pulse devices with new components with the goal of expanding the number of tests that the device could properly perform and that physicians could bill to patients. [Tr. 168–69; Ex. 103].

8. By August of 2015, UHSpro and Med-R had decided to abandon the upgraded MaxPulse device all together. [Tr. 171; Exs. 105, 106]. The parties decided instead to market a more

expensive RM-3A device that was manufactured by a different company. The parties concluded that the RM-3A was more reliable than the MaxPulse and that it could be used to perform a greater number of tests. As a result, UHSpro and Med-R concluded that the RM-3A could be used to increase the patient's bill and produce greater profits for the physician customers and themselves. [Tr. 172–74, 239–41; Ex. 104].

9. Therefore, in August 2015, the parties abandoned the February 26, 2015 contract to market and distribute the MaxPulse device.

10. UHSpro and Med-R agreed to move forward with a new arrangement to market the RM-3A device. Med-R agreed to an arrangement whereby UHSpro would purchase the RM-3A devices and Med-R would pay a monthly rental fee for each device. The parties agreed to the arrangement on a "month-to-month" basis with the understanding that Med-R would need to commit to a three month minimum term for each. Device put into service. UHSpro and Med-R would continue to evenly split the net revenue derived from the RM-3A. [Tr. 239; Exs. 105, 106].

11. In October, 2015, UHSpro proposed that the parties execute a new partnership agreement to reflect the new agreement to market the RM-3A device. UHSpro used the previous MaxPulse agreement as a template, and drafted a new contract that incorporated the previously agreed upon distribution and marketing arrangement for the RM-3A. UHSpro then emailed the draft contract to Med-R for approval, but Med-R refused to sign it. [Ex. 107]. Med-R was concerned about the problems it had experienced with the MaxPulse device and did not want to enter into a long-term contract.

12. In the latter part of 2016, UHSpro and Med-R agreed to begin transitioning to yet another device, the TM-Flow, which could support even higher billing rates to patients. UHSpro purchased new TM-Flow devices and began to retrofit some of the RM-3A devices so

that they effectively became TM-Flow devices. [Tr. 65–68]. The parties distributed the TM-Flow devices under the same month-to-month agreement they had previously used for the RM-3A device. [Tr. 178, 194–95].

13. In January, 2017, Med-R conducted a financial analysis of the month-to-month arrangement with UHSpro and concluded that it needed a higher percentage of the net revenue derived from the RM-3A and TM-Flow devices in order to make the arrangement profitable. In March, 2017, Med-R informed UHSpro that it required 65% of the net revenue from the devices, leaving 35% for UHSpro. UHSpro balked at this change to the revenue split, and Med-R decided to terminate the month-to-month leasing arrangement. Except for one device, Med-R returned all of the leased RM-3A and TM-Flow devices to UHSpro. Med-R acquired TM-Flow devices from another distributer and provided the devices to existing customers. Med-R offered to split the existing clients with UHSpro, but UHSpro declined the offer. [Tr. 249–52].

14. UHSpro sued Med-R, asserting a number of claims. [Docket 2]. UHSpro also filed this motion for a preliminary injunction. [Docket 7]. In the motion, UHSpro requests that this court enter an injunction that orders Med-R to comply with 15 separate mandates. The requested injunction would, among other things, order Med-R

    a. not to breach the February 26, 2015 sales contract,

    b. to continue to do business with UHSpro and equally share net revenues derived from all clients,

    c. not to utilize or copy various alleged trade secrets,

    d. not to compete with UHSpro in the marketplace,

    e. not to engage in any business opportunities without UHSpro's involvement,

    f. not to disparage UHSpro in any way,

g. not engage in any activity that would undermine a customer's confidence in UHSpro, and

   h. not to engage in any business that is similar to the joint venture between UHSpro and Med-R.

15. The court held an evidentiary hearing on the motion for a preliminary injunction on May 25, 2017.

16. Both in the motion and at the hearing, UHSpro relied upon two causes of action to support its request for a preliminary injunction: breach of contract and misappropriation of trade secrets.

**STANDARD FOR GRANTING INJUNCTIVE RELIEF**

To obtain a preliminary injunction, the moving party must establish: "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) ("As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." (citation omitted)).

While any preliminary injunction is an extraordinary remedy, the Tenth Circuit has identified three types of injunctions that are particularly disfavored: "(1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he

may recover at the conclusion of a full trial on the merits." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) (en banc) (Murphy, J., concurring in part and dissenting in part) (citation omitted). These disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* at 975 (per curiam).

As a preliminary matter, the court must determine whether the requested injunction falls within one of the disfavored categories in order to evaluate UHSpro's motion for a preliminary injunction under the proper standard. In particular, the court must decide whether the injunction sought by UHSpro is mandatory as opposed to prohibitory in nature. An injunction is mandatory "if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" *Schrier*, 427 F.3d at 1261 (citation omitted).

The Tenth Circuit's *Schrier* opinion is particularly relevant to the facts of this case. In *Schrier*, the University of Colorado terminated Dr. Schrier's appointment as the chair of the university's department of medicine. Dr. Schrier sued, and sought a preliminary injunction that would reinstate his chairmanship. *Id.* at 1256. The Tenth Circuit concluded that the requested relief did not disturb the status quo because Dr. Schrier merely sought to reinstate "the last uncontested status between the parties." *Id.* at 1260 (citation omitted). But the requested injunction was nonetheless mandatory because it required the university to affirmatively act to reinstate Dr. Schrier's chairmanship and would place the court in a position where it would have to supervise the forced relationship between litigation adversaries. *Id.* at 1261.

In this case, a significant portion of the injunctive relief requested by UHSpro is similarly mandatory in nature. UHSpro asks the court to order Med-R to honor its alleged obligations

under the sales contract to market and promote UHSpro's monitoring devices and split the resulting net revenues evenly, to continue the joint business venture, and to provide services to the joint venture's clients. [Docket 7, p. 2]. In other words, UHSpro seeks to force its litigation opponent to continue to participate in a cooperative business venture. Such an injunction would not be prohibitory in nature. It would force Med-R to affirmatively act on a daily basis to actively participate in and promote the parties' former business venture. Moreover, such a forced marriage between litigation opponents would undoubtedly place this court "in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *Schrier*, 427 F.3d at 1261 (citation omitted). The court would be required to determine whether Med-R had adequately performed its court-ordered duty of providing services to joint clients and working cooperatively with UHSpro.

UHSpro, therefore, seeks a disfavored mandatory injunction. Thus, the court must closely scrutinize the exigencies of this case when evaluating the four requirements for issuing a preliminary injunction.

## ANALYSIS

### I. LIKLIHOOD OF SUCCESS

UHSpro bases it motion for a preliminary injunction upon two of its causes of action: breach of contract and misappropriation of trade secrets. It argues that it will likely prevail on both of these claims at trial. The court finds otherwise.

*A. Breach of Contract*

UHSpro alleges in its complaint that Med-R breached a number of provisions found in the February 26, 2015 contract. The court concludes that UHSpro likely will not prevail on this

cause of action because the parties abandoned the contract in August 2015.Therefore UHSpro may not enforce it.[1]

The contract at issue here contains a Utah choice-of-law provision. Under Utah law, "a contract is abandoned when one party 'show[s] by unequivocal acts that he regard[s] the agreement as abandoned,' and the other party acquiesces." *Watkins v. Ford*, 304 P.3d 841, 849 (Utah 2013) (alterations in original) (citation omitted). Additionally, "a contract may be abandoned by the parties' express assent or through '*acts or conduct* of the parties inconsistent with the continued existence of the contract.'" *Id.* (citation omitted).

The scope of the contract between the parties was limited to the marketing of bio-monitoring screening devices for which UHSpro "owns exclusive and non-exclusive rights in the Americas and parts of Europe . . . and all other products and Product related thereto (collectively, the 'Product')." The only bio-monitoring screening device that UHSpro held rights to at the time the parties entered into the contract was the MaxPulse device. Thus, the obligations of the contract related only to the marketing of the MaxPulse device.

At the evidentiary hearing, UHSpro's representative testified that the parties abandoned the MaxPulse device a few months after problems with the device had been discovered in the spring of 2015. [Tr. 171]. Med-R's president considered the contract to be nonexistent at that point, and Med-R expressed its desire to enter into a different, month-to-month agreement with UHSpro. [Tr. 239-40]. Emails between UHSpro and Med-R in August of 2015 evidence the fact that the parties had moved on to a new RM-3A device, for which the parties had agreed to a new month-to-month leasing agreement. [Exs. 105, 106]. UHSpro's representative stated in one of these emails that the parties need to "create a new contract" to memorialize the agreement to market the new RM-3A device. [Ex. 106]. In October 2015, UHSpro prepared a new draft

---

[1] The court notes that the contract waives the parties' right to a jury trial. At minimum, therefore, the court will be the ultimate finder of fact as to the contract claim.

contract proposing new terms for marketing the RM-3A device, but Med-R refused to execute it. [Ex, 107].

In sum, by mutual agreement both UHSpro and Med-R abandoned all efforts to market the MaxPulse device by August 2015. The conduct of both parties was "inconsistent with the continued existence of the contract" to promote and profit from the MaxPulse device *Id.* (citation omitted). The parties therefore abandoned the February 26, 2015 contract and Med-R cannot be held liable for breaching any of its terms.[2]

### B. *Trade Secret Infringement*

UHSpro also alleged in its complaint that that Med-R misappropriated its trade secrets. In order to determine whether UHSpro would likely prevail on its trade secret claim, the court must first examine the threshold question of "whether, in fact, there is a trade secret to be misappropriated." *USA Power, LLC v. Pacificorp*, 235 P.3d 749, 759 (Utah 2010) (hereinafter *USA Power I*). In order for a trade secret to exist, the plaintiff must possess information that "'derives independent economic value' 'from not being generally known to' or 'readily ascertainable by' those who could 'obtain economic value from its disclosure or use.'" *USA Power, LLC v. Pacificorp*, 372 P.3d 629, 649 (Utah 2016) (hereinafter *USA Power II*) (quoting Utah Code § 13–24–2(4)(a)).

UHSpro's representative testified that the combination of several pieces of information constituted a protectable trade secret. Specifically, he testified that knowledge about bio-medical testing devices, a "no risk" model whereby a business could provide both the device and a technician to doctors at no charge in exchange for a share of the revenue produced by the device, the proper billing codes to submit to insurance companies and the Government to receive

---

[2] Some of the terms of the contract temporarily survived the mutual abandonment of the contract. A noncompete provision explicitly bound the parties for one year after the termination of the contract. Because Med-R did begin to market another competing medical device until well after a year had passed from the August 2015 abandonment, it did not breach the noncompete clause.

payment for the testing, and marketing materials for the business scheme, taken together, constituted a trade secret. [Tr. 19–23].

At the hearing, UHSpro's representative conceded that no single element of its business scheme was a trade secret. The court agrees. UHSpro had no secret information about any of the monitoring devices; it had only the publicly available information publicized by the manufacturers. Nor is the "no risk" sales model a secret. Med-R's president credibly testified that such a model is well known in the medical device industry. The billing codes are not secret; insurance companies and government agencies publish them and provide explanations on their proper use. Finally, marketing materials are by definition not secret. The entire purpose of such materials is to publicize information.

UHSpro, therefore, hangs its hat upon its theory that the combination of various elements of publicly available information was itself a cognizable trade secret. "[A] compilation of information within the public domain may constitute a trade secret." *USA Power I*, 235 P.3d at 760. In order to determine whether such a compilation trade secret exists, the factfinder may consider a number of factors, including:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in its business; (3) the extent of measures taken by the business to guard the secrecy of its information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting RESTATEMENT OF TORTS § 757 cmt. b (1939)).

It is unlikely that UHSpro's compilation theory will carry the day at trial. First, UHSpro and Med-R necessarily had to reveal this allegedly secret business model to potential customers in order to market it to doctors and medical clinics. In order to sign up doctors to participate in their business model, UHSpro or Med-R had to pitch it to them first. Thus, they had to reveal the allegedly secret compilation of the use of a monitoring device on a "no risk" basis while employing certain billing codes to obtain an optimal amount of revenue per patient. After receiving this compilation of information, the doctor was under no obligation to agree to participate in UHSpro's business scheme or to sign any contracts that may require the doctor to keep the business model a secret. UHSpro's claimed compilation trade secret is not like a secret manufacturing technique or formula that is capable of utilization without revealing it to the public. In short, UHSpro was required to expose its business model to the public in order to profit from it.

Moreover, upon examining the factors laid out in *USA Power I* for determining whether a compilation trade secret exists, the court determines that UHSpro likely cannot prove the existence of a trade secret. In particular, the court determines that the component parts of the alleged compilation trade secret are widely known outside of UHSpro, the compilation is known by a great number of employees at UHSpro and Med-R, who must market it, and it would be relatively easy for competitors to properly acquire or duplicate UHSpro's business model.[3]

*C. Conclusion*

Because UHSpro likely will not prevail on either its breach of contract claim or its trade secret claim, it has not satisfied its burden to prove a substantial likelihood of success on the

---

[3] In Addition, Med-R's representative credibly testified that it was Med-R, not UHSpro that brought the idea of the no-risk model to the partnership. Thus, one of the essential elements of the alleged compilation trade secret was not something that UHSpro could rightfully claim.

merits required for a standard preliminary injunction, much less the more exacting standard required for the disfavored injunction it seeks.

## II. IREPARABLE HARM

UHSpro likewise has failed to how that any compensable harm it may suffer is irreparable. "A plaintiff satisfies the irreparable harm requirement by showing 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011). An economic loss suffered by a business entity "usually does not, in and of itself, constitute irreparable harm." *Port City Properties v. Union Pac. R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008).

UHSpro argues that its goodwill with its clients will be damaged absent an injunction and that this lost goodwill is irreparable because it may be difficult to calculate. *See Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1192 (10th Cir. 2009) ("It is the value of this goodwill that the Noncompetition Agreements were designed to protect, and the incalculable damage to that goodwill can constitute irreparable harm."). Setting aside the question of whether any loss of UHSpro's goodwill would be so difficult to measure as to constitute irreparable harm, the court determines that any loss of UHSpro's goodwill would be minimal at best in this case.

At the evidentiary hearing, Med-R's president presented credible evidence that Med-R was the point of contact with the clients. In fact, UHSpro sought a joint venture with Med-R precisely because of its extensive contacts with doctors and medical practices. In the joint business venture between the two companies, UHSpro supplied the medical devices while Med-R marketed them to doctors and provided the technicians and services to maintain a good relationship with the clients. Moreover, it was Med-R that entered into contracts with doctors that obligated it to provide devices and services to the clients, not UHSpro. Based upon the

evidence presented at the hearing, the court finds that UHSpro had little or no goodwill or personal contacts with the end clients to be damaged. Indeed, there was no evidence presented of the extent to which any of the clients were aware of UHSpro or its dispute with Med-R. Thus any damages that UHSpro may have suffered because Med-R decided to terminate UHSpro as its supplier of monitoring devices can be compensated with money damages.[4]

III. BALANCE OF HARMS

UHSpro has not proven that the balance of harms weighs in its favor. When considering a preliminary injunction, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Because of the mandatory nature of the requested injunction, the harm to Med-R would be significant. Med-R would lose the right to control its business and would be forced into a business relationship for an extended period of time with its litigation rival. This would harm Med-R's business and prevent it from expanding or exploring other opportunities as well as potentially harming its relationship or contracts with its new supplier of monitoring devices. Even more significant, however, is that the requested injunction would force Med-R to continue an unprofitable business venture that could pose a risk to its own financial viability.

On the other side of the scale, UHSpro alleges that it will suffer substantial harm absent an injunction. But as noted above, any unjust harm suffered by UHSpro is compensable through monetary damages. Absent a valid claim of *irreparable* harm, UHSpro's harm is outweighed by the harm Med-R would suffer if this court were to enter the requested injunctive relief. *See Fish*

---

[4] UHSpro only mentions in passing its trade secret claim when it argues that it would be irreparably harmed absent an injunction. [Docket 7, p. 34]. Notably, UHSpro has not argued that it would be irreparably harmed absent an injunction because its alleged trade secrets would be destroyed through disclosure. The court, therefore, has no occasion to consider such an argument. Moreover, any unjust enrichment derived from Med-R's alleged improper use of UHSpro's trade secrets is compensable through money damages.

*v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016) ("We must next balance the *irreparable harms* we have identified against the harm to defendants if the preliminary injunction is granted." (emphasis added) (citation omitted)).

## IV. PUBLIC INTEREST

The court must also consider any adverse effects of granting an injunction upon the public at large. *Winter*, 555 U.S. at 24 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (citation omitted)). In this case, the public effects of the requested injunction appear to be minor or nonexistent. But the absence of an adverse effect on the public does not justify the mandatory injunctive relief that UHSpro is requesting.

## CONCLUSION

The court finds that UHSpro has failed to meet its burden to establish any of the four requirements for a preliminary injunction. It likely will not prevail on its contract claim or its trade secret claim; it has failed to demonstrate that any harm would be irreparable; the balance of harms weighs against it; and such an injunction would not serve the public interest. Thus, UHSpro has not established a right to a preliminary injunction, much less satisfied the additional scrutiny required for the disfavored injunctive relief it seeks. The court, therefore DENIES UHSpro's motion for injunctive relief. [Docket 7].

DATED June 23, 2017.

BY THE COURT:

_____
JILL N. PARRISH, Judge
United States District Court